Good morning everyone, thank you for checking in through the weather. How are you? Good morning, Your Honor. How are you, sir? Good seeing you. May I please the Court? Thomas J. Elliott, appearing for the appellant, Delaware River Port Authority. And appearing with me today is Stuart J. Greenleaf, Jr. and Thomas B. Helbig. With the Court's permission, I'd respectfully like to reserve two minutes for rebuttal time. Okay. As the Court knows, this is an appeal of a permanent mandatory injunction entered as a final judgment by the District Court of New Jersey on September 29, 2016. The crux of the appeal today is three clearly erroneous findings by the District Court. They're significant in their scope and they're significant in their impact. Mr. Elliott, can I ask why are we here? Is that an existential question? Why does a DRPA care? I mean, both of these entities appear to be responsible from all that we've seen. Is there something we don't know about Alpha that makes you say that this shouldn't happen? Absolutely, Your Honor. I think if I could point to the two critical aspects of the presentation. Alpha failed to submit, pursuant to Section 810.3 of the invitation for bids, the factors that are called experience modification factors. But it does have experience in other parts of the country. Well, this is the point. In a procurement process and in any agency's procurement review, they have to have a standard approach to their review of safety and performance. Well, Qualcomm didn't supply the right ones either. They supplied the wrong year. No, they did, in fact, supply the right ones. That's the misperception that this Court left. They didn't supply 2013. They supplied 2014 and 2015. Right. They did supply 2016, but they said, we don't need 2016. But why didn't someone respond when Mr. Kousis said, do you have everything you need? I mean, if the front page of the bid checked off that we have supplied the OSHA things and we have done what we need to do and it isn't there, why doesn't somebody pick up the phone and say, listen, there's something here. I mean, you had a problem with Qualcomm's 7.5% situation with the clean-up to make mobilization. Well, it was just Qualcomm, Your Honor, and there were three of them. There were three bidders, all three bidders. But Qualcomm is the only one that matters. The other ones, the bids were way off. But the security point is that they were all treated exactly the same way. The security point. In August, he sent a letter. I mean, up until that point, they had a non-responsive bid, did they not? They had a non-responsive bid. They put in a figure that exceeded the 7.5%. As a technical matter, as a technical matter, both of the bids could have been disqualified as non-responsive. Exactly. But there is no advantage to the agency. There is no advantage to the bidders to do that. Why do that at the front end of a process? Well, you've got 10 days, though, after the bids are open to raise an issue that wasn't raised and then Alpha is disqualified partly because of something that should have been brought to the attention of the authority within 10 days that wasn't brought to their attention. It's not true, Your Honor. We're looking at the guidelines. This is page 495 of the record. It says responsiveness determined within 10 days of the business day. But nothing was done. So is the outcome of that argument that Alpha should have been determined to be non-responsive? The outcome was that the award of the bid was arbitrary and not rational. Well, it wasn't in an arbitrary fashion. If you can look at the record, every aspect of the application of the two critical documents that the DRPA has consistently analyzed. When you say analyzed, the person who was analyzed, quote, analyzing, quote, unquote, the form said she made sure it was signed. Basically, she made sure it was filled out and signed. That was the extent to which she analyzed. That is not. That's what the opinion of the court says, and that's absolutely not true. Because there are multiple record sites in Mary Ann Stashevsky's testimony, and you'll recall that she's the director of risk management and safety, where she says. But she has no training in risk management, does she? Beg your pardon? Does she have any training in risk management? Her training in risk management came from 35 years in the insurance industry when she did exactly the same thing, but admittedly from a different perspective because she was doing it for the insurance carriers. She used the exact same criteria. Realize that the results of the EMF, the experience modification factors, aren't calculated by the DRPA. They're calculated independently by the workers' compensation bureau. It has to do with the workers' comp premium. We can argue all day as to whether it's an appropriate proxy for safety, but she specifically said if there's inconclusive information in order for me to adequately determine, I would confer with my staff. Did you do that? No, I didn't. Because they didn't have experience in Pennsylvania and New Jersey. Are you saying that anybody who does not have experience in Pennsylvania and New Jersey is totally disqualified from DRPA? That sounds like it's an inside track here. Are they disqualified because they don't have experience in Pennsylvania and New Jersey? If they can't comply with the requirements of the invitation for bid, that's a problem for any bidder. Well, how do they not comply because it looks like their safety record is better than Corcoran's safety record. One has to dig deeper than what is so-called the factual finding of the district court because there's not one citation in this opinion of the district court to the record. When this court reviews the record, the entire record, as it's required to do, before it reaches this conclusion that's in the memo. Was any review at all done of Alpha's record of safety outside the Hudson Port Authority area? You mean is there an independent entity that analyzes them? I understand that you require a work history within the Hudson Port Authority area. Is that correct? No. The requirement is the performance anywhere in the states of Pennsylvania and New Jersey. We want to know what your work history was. Who could have a greater interest in it? You cannot go outside of that area to assess a bidder's safety record then. In other words, if Alpha had a great, fantastic record in 30 other states, never had any problem, you would not consider that? It could be. That could very well be. In fact, it was in this instance because they had no... The question is what would you consider? That's the question. The bigger part of your honor? The question is what would you consider that? That's not for the purposes of this bid because it's inconsistent with the requirements of the invitation for bid. So you're saying if someone hasn't worked in Pennsylvania and New Jersey, they can't bid? That's correct. It was a hypothetical. It was created by the court that I think is more a diversion than it is a help. How does a new contractor get a job in Pennsylvania and New Jersey? Developing work history in Pennsylvania and New Jersey. Does it have to be for the Port Authority? It could be for the Port Authority in some other capacity. There could be a problem with the Government Commerce Clause there. Maybe a problem with the Government Commerce Clause. If a company has never ever worked, done any work at all in Pennsylvania and New Jersey, but they erected the Golden Gate Bridge, they erected these incredible structures outside of Pennsylvania and New Jersey, you're saying, well, they can't come into Pennsylvania and New Jersey because they've never done work there before. Agencies have the unique capacity and it's one where they are granted deference. If they have a... to establish their own criteria for, especially for something as significant as safety. But you determined that they were not responsible. That's correct. Because of this. No investigation was done as to their responsibility. I mean, under the guidelines, you have an affirmative duty of investigation. It's extremely strong, which says to me that you can't just say, oh, you know, you're not responsible. You have to determine that. You're saying that because their bid was not responsive, that that does away with your obligation to do the investigation as to their responsibility? No, that's not right, Your Honor. What I'm saying is the investigation was done. That's basically what happened in this. The letter said you didn't submit the OSHA forms and you didn't have EMF, so therefore you are not responsible. Even when they attempted at a later date to submit on August 8th, they belatedly submitted OSHA 300. Well, they asked before whether you had everything you needed and you didn't have anything else on there. Again, Your Honor, that's the answer. The question is still unanswered. They were not in there. The record is absolutely clear from the testimony of Amy Ash, who is the contract administrator, and Adam Jokorek, who is the project engineer. They were the two that were in the room on January 16th when the bids were opened. The documents were not there. We know that. We know that that's in equipoise, and the district court found there's conflicting testimony, so we don't know whether the OSHA forms were or were not supplied. But I'm asking about the responsibility determination. What investigation was done as to the responsibility and capability of ALPHA that supported the decision to say they would not get the award? Respectfully, it's not the role of the district court to determine that some other investigation could have been done. It's the role of the district court to look at the question. That's not the question I asked. I asked what investigation was done. The investigation that was done is as follows, Your Honor. The experience modification factors and the OSHA 300 forms were evaluated. They were inconclusive. They could not tell Mary Ann Krzyzewski that she should approve ALPHA's bid. And the criteria are, of course, there can be many ways to do a responsibility review. You could start calling references. Well, that's what this anticipates. I'm looking at 524 responsibility determination. And there has to be substantial reason for finding of not responsible. The contract should also document its reasons for its finding of not responsible and include the documentation with the contract file. We have none of that here. The substantial reason is clearly in the record. The substantial reason is the safety concern. A nonresponsive bid. No, it's not. It could have been determined a responsive bid. The DRPA, in its judgment, in its sense of fairness, did not throw out the bid. It could have thrown out ALPHA's bid for being nonresponsive. If you're relying on the failure of the OSHA factors or the OSHA forms and the EMA, then it should have been probably waived the right to do that. No, but they used the forms. They gave them the benefit of the doubt. They gave ALPHA the ultimate benefit of the doubt. They looked at the OSHA 300 forms. They looked at the EMF factors. And is that what they said in the letter, that they examined them and the investigation showed that they weren't? The letter of July 28th, where they were determined to be not responsible, says exactly that. At that point, they hadn't examined the OSHA 300 forms because they didn't have them. Didn't they have EMF 1.0, which is given to them by default because there was no prior record? Exactly. The only way they got 1.0 in Pennsylvania or New Jersey was it was a default number. It's just a number that's assigned by the Workers' Compensation Bureau. There's another way to get a 1.0. But she says that's acceptable. Beg your pardon? She said the 1.0 is acceptable. If it's an earned 1.0. And again, that's a bit of the diversion by the district court. They bought into the nonsensical conclusion, or the district court bought into the nonsensical conclusion, that a 1 determined by the Workers' Compensation Bureau through its calculations is equivalent to a 1 that is a default number. She said that could be sufficient. The 1.0 based upon the default could be sufficient in satisfying the EMF requirement. It could never be sufficient to satisfy the EMF. Why assign it then? Beg your pardon? Why assign them a default number? You think you're getting a zero. Well, in fact, that's exactly what the June 10th letter from the broker for Alpha said. You have a zero. Mary Ann Stashevsky, whose experience was greater than Beverly Annunziata's, said no, it's not a zero. You don't have a zero. You have a 1. But that 1 is of no value to me because I can't use it in a critical analytical way. And Alpha did not qualify for any EMF rating, I assume. That's correct. There was one year. I take that back. There was one year in Pennsylvania when they had a .805. So it could not have its rating adjusted in any way? No.  You saved some time, I think, for it. I did. Thank you, Your Honor. I think we're back to the beginning, and I'm sorry, I apologize. I wanted to welcome and note the presence of some very distinguished guests from Japan. We have with us the Honorable Judge Takao. I hope I'm pronouncing that correctly. And some of his colleagues. And we welcome you, sir. And hopefully we won't do anything today to chase the dim light on the judicial system in the United States. But I'm glad that you're with us with your colleagues. Thank you. Good morning. May it please the Court. Jennifer Radel from Gibbons PC on behalf of Alpha Painting and Construction. I think that I need to start with correcting a few of the statements that were made here this morning and that are just not supported by the record before the District Court. DRPA tells the Court this morning that the 1.0 default EMF could never be sufficient. That is not what Ms. Staszewski, I will get her name wrong, I'm certain, more than once today. That is not what she testified. She said it could for a new contractor. She precisely said that new contractors are not disqualified per se. Whether that's true or not, I don't know. But that's what the record is. What are you relying on in the record? Can you be specific? Because everybody's talking about what the record says without citing to it. That is at A1784 to 1784 to 1785. DRPA also talks a lot today about there being a safety concern as a result of Ms. Staszewski's inability to use the 1.0 to calculate and realize that that's under 1.25. But she also testified quite clearly and went out of her way in cross-examination to correct counsel and say, what I do is not a safety analysis. So the Court is absolutely correct in suggesting that she has no safety experience. And what she does is clerical. But the EMF is important in the bid process. Now the District Court criticized it extensively. But isn't it really a proxy for safety? It is. I mean, the Port Authority has a substantial interest in ensuring that the bidders have a good safety record. And it could not assess Alpha's safety record in this case. I don't agree that it could not assess Alpha's safety record. There is certainly, you could reach the conclusion that an EMF is a proxy for some small portion of a safety record. But that's only workplace safety. There are a lot of other safety concerns that are raised in the brief that are just not measured at all by the EMF or the OSHA. What should have happened here? What should have happened here is that once the DOPA, as Your Honor said, waived the responsiveness, there should have been a fair and reasonable assessment of Alpha's qualifications to perform the work. But did you offer any kind of safety record to the Port Authority? Did you say, no, no, we have a perfect, we have an excellent safety record? The only information they asked for are the EMFs and the OSHA forms. We did provide the OSHA forms as the court acknowledged that evidence was an equipoise of the District Court as to whether or not they were really there, but ultimately found that was irrelevant. But they had the OSHA forms by the time of the bid protest. Do you know if the District Court was able to assess Alpha's safety record? When it made a decision to award the contract to Alpha? What the District Court did was look at the information that Ms. Daschetzky says constitutes her analysis. She says she looks at two things. She looks at the OSHA forms and she looks at the EMFs. Now her testimony about what she does with the OSHA forms is a little suspect because there's just no testimony in the record that she actually, she can't explain what on those forms had any impact on her analysis. That being said, the District Court looked at them and said, I've seen one injury over the course of three years.  That's an employee injury. Pardon? That's an employee injury? That's an employee injury on the OSHA forms. So the OSHA forms only reflect injuries to employees. Correct. So I designed a bridge and during the course of designing the bridge, none of my employees are injured. But the bridge collapses and the duct is open and 100 commuters plunge to their death. Yes. Under the EMF form, I have no problem there. You have no problem there. And Ms. Daschetzky's testimony is that's not of her concern. That's not what she looks at. There's nothing that comes to her as part of this risk management assessment that measures that. It's just not what she does. So maybe this is faulty and maybe it's slipshod and shouldn't have happened, but there's a very high bar here as to the arbitrary and capricious, irrational, illegal. How do you specifically meet that bar? The district court looked at this entire process and found that what Alpha was entitled to was a fair and reasonable assessment of its qualifications, and if the DRPA found that we didn't have those qualifications, we were entitled to a coherent explanation that gave facts with a rational connection to that determination. The district court found that neither of those things were satisfied here. And when he looked at the facts, he said, first we have a letter that says we're going to deem you not responsible, not capable of performing this work because you didn't provide two pieces of information. That in and of itself seemed irrational and arbitrary to him because the lack of information has no bearing upon your capability to perform the work. He said, let's look past that. What did they do? They looked at the OSHA forms. Okay. She has no testimony. She says she looks to see if they're signed and what the number of hours worked are. She cannot explain what impact that has on her analysis. She cannot explain how many, there's nothing on a form when asked, how many injuries would it take for you to reject? I wouldn't as long as the EMF was below 1.25. So the district court concluded that not only are you giving me a reason, the lack of information that has no bearing upon the capability, but now you're telling me that you're rejecting them because they didn't provide something that really plays no meaningful role and there's ample support in the record for that. He looked further. He said, okay, you didn't have the OSHA forms. Qualcomm didn't have its EMFs. And there's no dispute here. One of the indicia of arbitrary conduct is not treating similarly situated people the same. They called Qualcomm and asked for the missing information when they neither called us nor even responded when we made affirmative inquiries. From Qualcomm's forms, the court was, I'm sorry, the court authority was able to determine the number of workers' compensation claims that were filed and the number of injuries that had been caused as a result of Qualcomm's work. That same analysis was not possible with regard to Alpha. It was by the time of the bid protest, certainly, although we continued to contend that the evidence suggested that the OSHA forms were included within the original bid. But the bottom line is that none of the information on Qualcomm's forms mattered to the DRPA. So the fact that the form was there was really irrelevant to its approval of Qualcomm. Do we know the extent of DRPA investigation in other types of bid situations? There's nothing in the record to that effect, is there? There's nothing in the record to that effect. The Allied Painting case, which I acknowledge is an unpublished opinion, gives some insight as to what happens in other instances. And I think that the contrast is stark. There were some questions there with the bid on behalf of Allied Painting, and I believe there were some meetings, there were sit-downs. Ultimately, the DRPA found that that bidder was not responsible. But the other stark contrast is the type of reasons that the DRPA gave in Allied Painting. Allied Painting, they did point to a number of injuries on the very bridge that the bid was about. A fall on that bridge, an additional fall on the bridge during the bidding process. The fact that that bid was so substantially lower than what the engineering department had estimated that they weren't really sure that Allied knew what was going on. And their bonding company was insufficient. So there were real needy issues there that went to Allied's capability to pursue the project. Let me ask you another question about the award of the bid. I mean, Mr. Venuto testified that when there was no approval from Mr. Szewski of Alpha, that the investigation into their responsibility came to an end. Given that, can we really say that, oh, hand this contract to Alpha on a silver platter as compared to sending it back for DRPA to do responsibility determination as to both these bidders and come to a conclusion? I think that you can because there's a long process here. And the DRPA has come forward. There was a process. I'm sorry, not with respect to what happened in the agency. But the bid protest, our request for a hearing in denial, issues before the district court. The DRPA now claims that there's some undefined potential problems with Alpha having this contract. But they've never come forth with any reasons other than the two that they provided in that initial letter. So they never did the investigation they're supposed to do. I'm not certain that the record's 100% clear on that. I didn't urge you that question. Pardon? Maybe I misinterpreted it. It sounds like a softball and you want to take a swing at it. The only reason I'm hesitating is because I don't recall the testimony of Mr. Venuto that you're precisely referring to. But my recollection of the testimony is that he simultaneously sent all the information out to risk management, to financial, to the minority business office. The only disapproval he received was from risk management. Of the other departments. He's saying the only disapproval he received. Everyone else approved it. Do we know, does the record show, who in risk management was responsible for the decision? Ms. Stachewski is the sole person who performs the risk management analysis. This, however, leads to one of the other very important things that this report found, which is that there's no testimony about who made the determination that this leads to an affirmative finding that you're not capable of performing the work. Three people testified. Ms. Stachewski thought it was Ms. Ash. Ms. Ash thought it was, I think, Mr. Jasuric. Mr. Jasuric thought it was Ms. Ash. Nobody would claim responsibility for saying, yes, we think this rises to the level of... And then you don't get the polarization of lump sum. Is that quantity automatically assumed, I guess, for whatever reason, to be 7.5% of the total job? No. How does that derive? So there's actually three different types of line items in the bid. There's a lump sum, which is tell us what you think it's going to cost. There's a predetermined amount where DRPA says we're only paying $75,000 for this line item. And then there is the price per unit measure. The price per unit measure is, I think the example in this bid is caulk. So the only price per unit measure in this bid is we think it's going to take 360 tubes of caulk. Tell us how much you're going to charge us for the application per tube. That's a price per unit measure. But mobilization is a lump sum. And elsewhere in the bid, so you just say, this is what I'm going to charge for mobilization and cleanup. Elsewhere in the IFP, it says, by the way, we're not paying more than 7.5. But the testimony is clear that from both of the DRPA representatives that that mobilization and cleanup is not a mathematical calculation. A bidder could bid 5%. A bidder could bid 7% if they really want the job. So it's not about telling the bidder how much they're going to get for the cleanup. It's about saying you can put into it whatever you want to. We're not paying more than X dollars for that. Correct. And it renders the bid nonresponsive if you're choosing to bid over 7.5%. I would also just – I just want to ask you one question because I found the remedy that the district court employed quite unusual. After finding the bidding process defective, the district court then decided that it would award the contract to the other bidder. Is there precedent for that type of action by a district court, as opposed to, for example, sending the matter back for rebidding or investigation of the bidders who were involved in the initial process? There is no case that we can cite in the Third Circuit affirming an award like that. But that is in very large part because all of the cases cited by DRPA suggesting that the relief is inappropriate are where the defendants were entitled to some measure of sovereign immunity, and there's the underlying doctrine that – How does that really matter? I didn't find that really a distinctive factor. Because, Your Honor, the only reason that the relief is limited in those cases is because even though sovereign immunity is waived and someone can sue that entity, there's a line of authority that says that notwithstanding a waiver, you cannot afford specific performance against a government agency that has sovereign immunity. Was that the analysis in those cases? It doesn't analyze it. But if you look at C-LAN, the only cases that it cites in support for that proposition do go back to that analysis, and they ultimately go back to Bowen v. Massachusetts, I believe, from the Supreme Court. Do you think C-LAN helps you? Do I think C-LAN helps me? I don't think C-LAN hurts me. C-LAN establishes the three factors that are necessary for an injunction, and the district court found that each of those were here. So with respect to the remedy, it was an unusual remedy that the district court did not take lightly. He understood that it is left for unusual circumstances. But here, having found what he did about the process, having found that deciding that ALFA is not incapable of performing the work, having found that the recalculation and the substitution of a number in CorConn's bid is inappropriate, there's nothing left for the agency to do. We know who the lowest responsible bidder is. The closest case we found was out of the First Circuit. It's called Ulstein, cited in our brief. In that case, the circuit affirmed an award of an injunction to the next lowest bidder. In that case, it wasn't clear who the next lowest bidder was because they only analyzed one bid. But here, there were two bids analyzed, so we know what the effect is. Practically, the relief is the same. Thank you. Thank you. May it please the court, I just have two or three points to make. Make it three or four. Two or three, I don't have two minutes. Let's not talk about how much time I have. We'll explain those. Thank you, Your Honor. I'll start just with one point. Let's start with this point. Okay. Do you contest the fact from what Ms. Guido said in my reading of this, that we don't really know who's responsible for the decision here? I may have asked you that before. No, because it was a collective decision. There's testimony in the record that Ms. Deshefsky said it, that it was a collective decision among the agency management. The manager, Deshefsky, and whom else? And it was also testified to by Chief Engineer Venuto that this was a team determination. So the team is Venuto, Deshefsky, and Deshe? Well, I think that he may have been more inclusive in that, in his description, because it included the people with whom he spoke, which included counsel. So I wouldn't just restrict it to those three. But counsel didn't make the decision here, right? They were certainly involved in the discussion. They didn't make the decision. That's in the legal issues. But in terms of who substantively decided, not in the legal issues. The factual determination. You're right. Venuto, Deshefsky, and Deshe? Yes. Neither one of whom took responsibility for the decision that collectively they all made? Yes. Interesting. And I think there's a critical question that Judge Randall posed as it relates to Sealand. The holding in Sealand is really the critical thing, and the holding was that in the circuit, this court did not have the power to order, or the district court did not have the power to order a governmental agency to award a contract to a particular bidder. Absolutely clear that that's the holding. As it relates to the investigation that was done into Alpha and Corcon, they were done exactly the same way. Ms. Deshefsky said whenever she had a question about EMFs, as she did here, she called the person who submitted the EMFs. And the EMFs are traditionally submitted by the insurance broker for the bidder. She never calls the bidder. And the reasons why they don't call the bidders was testified to by at least three of the DRPA witnesses. And they testified to avoid the appearance of any collusion during a bid process. They do not contact bidders during the pendency of a bid. And it's a rational, it's a very thoughtful, and it's an absolute rule that was followed in this case. The court inquired whether there was some mandate, whether there was some directive. There isn't one, but it's a good practice and procedure, and it's one that they used consistently here. Not only did she call the broker for Alpha, the woman had no information for her. She confirmed that the woman had no information to assist her in her analysis. She also called Elaine Grosser, who was the broker who submitted the EMFs for Corcon. Exact same procedure, exact same email response confirming the results. Alpha had no data to supply that was going to lend or enable Ms. Toshefsky to make her risk management decision. Corcon bid when they submitted it. Had no data to supply with respect to work in the Hudson Port Authority area. I couldn't hear you, Your Honor. I'm sorry. Had no information to supply with respect to work done in the. That's right. There's evidence in the record. Koussis testified that on July 7th, he asked DRPA if they needed additional information to review the bid, and that no one responded to him. That's correct, and that's exactly the process that I said or why they don't get involved and traditionally do not get involved in calling brokers during the pendency of a bid. First of all, the only information that they needed wasn't supplied by Koussis. It was supplied by the broker, and that's who she contacted to get the information. That was her practice. That was her procedure, and she followed it consistently in this case. Could you tell me what a port authority's basis is, what the rational basis is for excluding safety records by a bidder outside of the Hudson, New Jersey, Pennsylvania, Delaware area? I think the rationale is they have to start somewhere. They have to have a standard. They have to have something that's a calculated number that they can analyze and that they can analyze consistently across the board. It's a number that is recognized in the insurance industry, that if the average of the three years is less than 2.5, that's acceptable. If it's more than 2.5, it's not acceptable. How does that have anything to do with the geographic prohibition that you impose on bidders? The result of the 8.13 of the IFB is that it calls for that data from Pennsylvania and New Jersey. I understand that, but why do you limit it to such a small geography instead of allowing bidders to provide safety records from wherever they have done substantial work? I think one answer to that, Your Honor, and I don't think it was even pursued in the lower court, is manageability. An agency has the discretion and is granted that deference traditionally by the district court to establish. It's standard. We realize there was no expert that came in and said, wait a minute, I'm an expert and I'm going to testify that this is an inappropriate standard. This is not a broad enough review. We're just asking. Quarantine could have a perfect record within this area and a horrible record outside the area, but you wouldn't consider that horrible record. This is a hypothetical. They could have a beautiful record outside, but just as a hypothetical, they could have a terrible record outside of this area. You wouldn't consider that at all. Well, it wasn't considered in this case, Your Honor, and I'm talking about the relevance of the inquiry here. The relevance of the inquiry here was consistently followed, or consistently followed the procurement manual of the DRPA. You're saying this is a state agency, which we're talking about, right? It's a bi-state agency created by Congress. It's amazing, the Pennsylvania agency. That's what the two states are, Pennsylvania and New Jersey. It's not devoid of rationality that they chose Pennsylvania and New Jersey. Can I speak now? I beg your pardon. As a state agency, no matter how it's composed of one state or two states, then the state agency is saying that it's only going to consider bidders that have done work in that area before. There's no government commerce clause before us, but that seems to me to be really problematic, that business is limited by the DRPA to only those entities that have done business in those two states before. The only response that I have, Your Honor. I can't believe that I can actually stop you from talking about this. You made it the highest point of my judicial career. I don't think it was possible. That's the way we do it. The only thing that I can offer is that what, in a rational basis, two states have more interest in the safety performance and the safety records of the contractors who are going to be working on a particularly dangerous job like this and a particularly vital job like this where safety of the people, whether it's the residents of Chester, whether it's the people at the Talon Stadium, whether it's the more than six million vehicles that go over the Commodore Barrie Bridge every year. Those are the safety concerns that were raised by the DRPA on a bridge that connects Pennsylvania to New Jersey. Thank you very much. Thank you, Your Honor.